May it please the court. There are three issues that we believe would benefit but most from oral argument, and they would be obviousness, infringement of the seat, shopping cart claims, and damages. And of course, happy to answer any questions the panel may have on any subject. Starting first with obviousness. The district court here took the extraordinary step of preventing obviousness from even being heard by the jury. This wasn't just one patent in one claim. This was three patents in seven different claims. All as a matter of law precluded the jury even considering. Can I ask you about that? The judge in the final opinion really just spends one paragraph on this question on why this is not certain of them went to the jury, right? Some of the anticipation claims went to the issues went to the jury. You're right anticipation. And that's an important point. Anticipation did go to the jury. So, and it seems like, I mean, all I can glean from this one paragraph, it's at 22 in the blue brief at the end, is he didn't express that your expert, Mr. Tittle, did not express any opinions on obviousness or conduct a proper Graham analysis. Can you tell me what the focus of the what was he saying was really deficient about the analysis? Was it just that the guy didn't know pie at the end of the day? As a matter of law, this is obvious. I think you're honored to cut through it. That was ultimately what the basis was for the issue was that he that the the expert did not ultimately say, I reached a legal conclusion of obviousness. But there's a problem, right? Because there are certain elements that were not identified in the prior art, namely, at least on the 314, the product identifiers and the shopping cart database. Well, it depends. I mean, let me let me step back. First of all, the district judge found that there was substantial evidence that every element was present in the prior art because he denied the anticipation. So the district court judge thought there was sufficient evidence on that. There are debates on some of those items, but that's conflicting evidence exactly the kind that the jury should consider with respect to identify a product. I mean, that's a number that's associated with a product. I mean, it's not the type of thing that you would think you would need to have even in the prior. It's a basic shopping. So there's not a debate as to whether those elements are there. You're I thought your argument in gray is that those aren't necessary to be identified in the prior art because they're either intuitively obvious or any expert would have known how to do this and so forth. Well, I mean, it depends which one you're talking about, because there's an assertion that there's a lot of things missing, and I don't think that's right in terms of a shopping cart database. I direct you specifically to 82375, where our expert, Mr. Tittle, said simply knowing that you can do something like store information about purchases means that a competent programmer can figure out how to do it. I mean, what we're talking about is storing product identifier numbers in the database. I mean, the shopping cart sounds pretty rudimentary, and it is very rudimentary. It's just memory with product numbers for what the product is. So to say there's no disclosure of a shopping cart database, the CompuServe shopping mall, which was actually a closed network for shopping, which existed in the prior art, which had millions of transactions, had shopping cart stores, according to Mr. Trevor and Mr. Tittle. There's no question that it had shopping cart. That's at 82142, 82148, 82151. All of those are the presence of shopping carts, which they call the personal holding file there, because that's all it is. The debate was, well, does the manuals that talk about the shopping mall show the database? And the answer is they're stored somewhere. Of course that's a database. I mean, it can't be that that's enough to prevent the jury from even considering whether or not this is obvious. We're talking about the use of traditional shopping conventions moving from a closed network to an open network or from a brick-and-mortar store to Internet, either way. I mean, it can't be that this isn't something where you can let a jury consider whether the idea that we're going to have a place where you list the products you're going to buy is something that the jury can't consider whether that's obvious, because the manuals show that there's a shopping cart, but it doesn't say shopping cart database in specific detail. So for those reasons, I think that the obviousness clearly should have been, and the lack of analysis that the court pointed out at the front, which was a throwaway on the oral record and then a couple of sentences here, is not enough for three patents, seven different claims, things like a receipt that you have in HTML, like a link like we use on the Internet to just get to a receipt. That's itself supposed to be an invention with an independent claim. Well, so Mr. Reines, are you arguing that as a matter of law, this court should review the JMOL that was as decided by the district court, or that the court simply made a mistake in relying on the absence of an expert conclusion? You said you can't give it to the jury because there wasn't... I think the latter, as you've articulated, I think that it was reviewed de novo. Was there enough to even say that there's something enough that a jury should consider whether a shopping cart or a receipt is obvious? I think that's relatively straightforward that, of course, so, and that's just a de novo review. There's no deference. And the jury should actually, a jury should actually be able to consider obviousness. I mean, there's a remand already on one of the patents on the current records. It's going back down anyway. Let me move to direct infringement on the shopping cart claims, if that's all right. Can I, which is that, those are the 314? That's, well, it crosses patents. That's claim 34 of 314 and claim 17 of the 492. Can I just ask, if, let's assume on the direct infringement, it's my view that your stronger case is with the 492, the claim there. And the jury form is a little unclear to me because with respect to the damages award, it says 314 and or 492. So, assume we would agree with you on infringement issues with regard to the 492, that wouldn't necessitate a remand, would it? Because if we affirmed, in other words, if we affirm on one patent, but not the other, what do we have to do? I think it has to get reversed, I mean, at a minimum on damages because they argued that there's these three different features. And if there's only one of the features that we're actually using, not three, how could the damages be the same? I don't know if there's infringement. Does it really matter how many claims are infringed? How many patents? I believe it does. I mean, I think that would materially change the damage calculus. Can I move to the shopping cart?  Of course. Even when the language in the jury form says 314 patent and or the 492, which means they could have decided that it was just for the 314 and not the 492? This goes to the point, Your Honor, that the claims types actually cross the patent. So, shopping cart is in the two patents and then the receipt claims are in the 492. Thank you, Your Honor. So, on non-infringement of the shopping cart claims, there's a fundamental distinction between the patented shopping cart and the way the new egg system works. In the patented shopping cart, what's contemplated is there's a customer with their computer that clicks they want a product and moves it to the shopping cart. And that enters into a shopping cart at the server at the Internet retailer, one by one. And there's a requirement of there being a plurality of messages and a plurality of products they collect there. And that's the way that system works. And it's specific. It talks about modifying the shopping cart in the shopping cart database, which is at the Internet retailer. And that it's modified, which I think is clearly between that and the plurality of messages show it's the one-by-one purchasing. The way the new egg system works, which is different, is a customer has a cookie. So, the customer isn't talking back and forth to the Internet retailer. It's picking a product, putting it in its own memory, picking a product, putting it in its own memory, picking a product, putting it in its own memory. Then en masse, that all goes and creates an entry in the shopping cart database. There's no modification in the shopping cart database. There just isn't. Any evidence that you or your clerks look at that's supposed to support that will not support that. It is not how the system works. And in fact, Solorane concedes, this is at their brief at 27, that there's no physical memory allocated at the shopping cart database until en masse, the shopping cart ID and the products all go in there. So, if there's no memory in it, it's nothing. I mean, how could you call it something? And then all these things go in at once. That's not this plurality of messages and modifying things while in the shopping cart database. Let me move last to damages, which is a very important issue here, assuming that the court upholds the rulings otherwise, which we don't think for the reasons that are in our brief and I just articulated. This is a multi-million dollar verdict, and there was three fundamental errors. The first error, which is conceded, is that they used the 25% rule to come up with a pie-in-the-sky number that changed the whole damages horizon. Right, but the argument is that it was harmless error because when you calculate the numbers out on the ultimate verdict, it doesn't appear to have any relationship. That is absolutely right. They concede error, legal error by the court, and I assume in denying the Daubert, in letting the expert do it. There's also the number dropping. They were dropping well. There's $2 billion of sales they have. Yeah, but what's your answer to the harmless error? I'm happy to address. The answer on the harmless error is that the damages number was 2.5 million that was accepted by the jury. There is no evidence in this record, you can look high or low, that justifies more than a $500,000 award. Let me get very specific here. We have an extensive licensing history of this patent, of this patent. 19 licenses of this patent at the time, 2001, when the hypothetical negotiation, at the exact time period of one year of 19 licenses. What is the proportion of the licenses that were looked at that were to large retailers versus smaller or medium retailers? Excellent question. So there was 19 that you would call to smaller retailers, which Newegg was at the time of the hypothetical negotiation. Those are in the record for damages. Another error that we believe was that there was litigation settlement to Amazon and Gap, and everyone agreed that was inappropriate to consider those under 408 for damages. So those don't relate to damages at all. They don't even put a reason in their brief as to why those were in. They were supposed to counterbalance the fact that they'd licensed smaller internet retailers. But let me get back to this pattern of licensing. So the extensive patenting licensing history for this patent, RescueNet, all these cases talk about real-world evidence. And guys, we're talking about a shopping cart or a receipt in the internet. If you went to your brick-and-mortar store around the corner from you, your supermarket, and you heard that they got a new shopping basket or a shopping cart, and someone said, we want a share of every product that goes through your shopping cart or your checkout stand because you've got a better shopping cart now, you'd be outraged. And the fact that we're moving this to the internet doesn't mean all of a sudden you get the share of all the products that are all admittedly non-infringing. Are you complaining about the royalty base or are you complaining about the discrepancy between the amount of? Excellent question. So I went from why it's not harmless error to, in that point, the absence of an entire market value analysis and the use of a non-infringing base. So there's two sets of errors looked at that way. There's a 25% admitted error, and there's the non-infringing base error, which I think is plain based on what I just articulated. The point of all of this is we have real-world evidence of the value of this. In 2001, when the hypothetical negotiation, 19 licenses, all below $300,000. And that's not the only evidence we have. The company, Open Market, which came up with these patents, and sold the patented solution, which they thought would be their shopping mall. And it didn't work out. Bankruptcy ensued, all those things. But they sold that product, a license, not only to use all the patents, but to use their software, which is Plus. And all of those were less than $300,000. That's another nine to get 20. Are you arguing for a new trial on damages? It doesn't seem to me you are. Our position is both. We think you should enter an order directing the district court to enter a verdict to the extent you maintain liability of $500,000. This is under the Tronzo case, which is important. In Tronzo, this court, the second Tronzo too, the Tronzo court said that where there's no substantial evidence to support a verdict above a certain amount, that you're not, that it's appropriate without remand for a new trial to enter that amount is the right number. It's a very interesting law if you look at Tronzo, which obviously is this court's precedent. It says that, so we're saying set it at $500,000. That's the right number under Tronzo. There's nothing justified. $2.5 million is 5x. You know, good enough for government work doesn't work for this stuff. There's millions of these cases that are against internet retailers all the time. We can't have someone putting up an admittedly erroneous opinion for $20 million and dropping $2.5 billion as how much this company's made over the life of its history or whatever it is and then have that inflate the number 5x from real world licenses when this court's authority says look at the real world. We only get into this hypothetical negotiation game that's difficult for everybody on both sides when we don't have real world evidence. But we do. 19 licenses and then 9 of the software. So I think all those bases demonstrate why, at a minimum, if you were going to remand for a new trial, which I think is equally justified for them allowed to parade the Amazon settlement and these other settlements, not even on damages, to make it look like we were holdouts. I mean, it's hard in the 20 minutes, 15 minutes here to give you guys the feel for that. But obviously I want to reserve three minutes. Hopefully I've answered questions. We'll save you rebuttal time, Mr. Rehanes. Let's hear from the other side. Thank you very much, Your Honor. Good morning, Your Honors. Mr. Wilson. I'm Robert Wilson on behalf of Sovereign. And I think I would like to address the damages issues that were just raised as an initial matter and, of course, answer any of the panel's questions that you might have. Mr. Rehanes has mischaracterized what the evidence was at trial with respect to damages. Here we have a situation where even though the 25 percent rule was touched upon by our expert, it had no impact on the jury's verdict. And I think that you can reach that conclusion by just looking at the quantum of damages that was awarded by this jury. How did the expert reach the 25 percent, his bottom line assessment? He did rely on the 25 percent rule, Your Honor, and he came to a conclusion that damages, a reasonable royalty in this case, would be $22.5 million. So if you compare that with the jury's verdict of $2.5 million, that's a tenth of what our damages expert actually testified about at trial. But how can we know if the number was out there, if that was the starting point? I mean, the 25 percent rule wasn't that the award has to be 25 percent. That's the kind of starting point. It's the rule of thumb, and you work off of that number. So how can we know that that number had no impact on the jury, at least as a starting point? How do you know that for sure? Because the jury's verdict of $2.5 million indicates that the jury didn't use that as a starting point because of the other evidence that was in front of the jury at the trial. So you had an expert that used the ultimate $2.5 million number? No, you weren't advocating for $2.5 million. That's correct, Your Honor, but in light of all of the other evidence that was in front of the jury regarding— So there's not one expert you can point to that said, well, the jury clearly adopted him. They bought precisely the numbers he gave them, right? Well, I think that you can when you take a look at Sovereign's number of $22.5 million and you take a look at the $500,000 that was proffered by Newegg, and the jury was way down close to Newegg's number in its verdict. And that verdict is reinforced by the other evidence that was in front of them, particularly with respect to the Georgia-Pacific factors. And there was a large amount of evidence with respect to Newegg's extensive use of this technology and the nature of the technology as being fundamental to the operation of the website. Why isn't this driven, as Mr. Reines suggested, by the licenses? Well, the licenses are an interesting point because Newegg relies on those licenses but fails to discuss the evidence that showed that the licenses had limited comparability to a company like Newegg. These are mom-and-pop type shops that are being licensed for the divine licenses. These are bricks-and-mortar type businesses that have a little bit of an online activity on the side. The nature of their revenues, which was before the jury, was on the order of $50,000, $10,000 worth of online sales, as compared to Newegg, which is a totally online distributor, retailer. It has no bricks-and-mortar stores, and it has hundreds of millions of dollars worth of revenue. So the comparability that Newegg relies on with respect to those licenses is very limited. In addition, there was additional evidence regarding licensing of the Transact product. And as the testimony showed at trial, contrary to what Newegg says, there was more than just a single payment up front. Those payments were spread out over the course of the years for the companies that had licensed the Transact product. That was also before the jury as an alternative economic model, real-world model, that was before the jury as opposed to the divine licenses. So you can't just look at the divine licenses and say, oh, well, there must be $500,000 here, that's the only evidence. There was much more evidence talking about Newegg's extent of its use, talking about the fundamental nature of the technology, talking about the Transact licenses versus divine licenses, and talking about the differences between Newegg as a online-only type retailer versus these very small, like I say, mom-and-pop type retailers who have only a few tens of thousands. Can I move you off of that for a moment onto the obviousness issues that Mr. Rinas talked about? Absolutely. Mr. Rinas. What is your read of what the district court was really talking about when he said, he said an expert, the opinion, the legal opinion. Does that mean that he didn't ultimately opine as a matter of law? It's obvious. And what are the Graham factors that he was referring to? Yes, Your Honor. Let me address all of those. The district court did not just grant JMOL because the expert didn't say the words, and I find these claims to be obvious. The district court took a look at all of the evidence, and it is fundamentally deficient on a number of Graham factors. Basically, what Newegg's expert did was he talked about certain prior art systems, and then to the extent that there were claim limitations, and there were numerous claim limitations that were not found in these prior art pieces, he just basically waved his hands and said, well, you know, there's a lot of work going on in the Internet, and so somebody would be able to fill this in. But he let it go to the jury on anticipation. I think he did, Your Honor, because the testimony was directed to specific systems that were in the prior art, and he let that issue of is each one of these systems, is there anticipation? But I think that the teaching away issues that were raised by sovereignty. But wait, let's go back to it. Let's take this one at a time. I mean, there's the legal opinion stuff, and then there's the other point you were making under Graham. Yes. That there were numerous elements that were missing. Yes. How then could he let the same – did the same claims go on anticipation to the jury? Yes. Those same claims he didn't let go on obviousness because – So he let it go on anticipation in the absence of elements but not on obviousness? He didn't on obviousness because there was also evidence regarding teaching away and regarding the combinations that they were relying on. So it was a different analysis, and he was looking at the arguments that were saying in fact – So there was evidence on teaching away, but that's a question that goes to the jury all the time, right? But there was no rebuttal with respect to Newegg's arguments. Newegg didn't have any response to this idea that there was teaching away. Not only was it teaching away, it was that the systems would be fundamentally incompatible in the way that they were trying to combine it, and that was key to their obviousness case. They were saying, well, if there's an element that's missing here, then you can rely on this other general Internet technology, and you can fill in the blanks, and yet if you tried to put those two things together, the art was going in the opposite direction. The art was going towards a connection that was a one-to-one customer-to-server connection as opposed to what we are used to today, which is being able to go from website to website across the Internet. Those are fundamental differences in the art that if you try to put these two pieces together, they just don't work, and there was absolutely no evidence from their expert to rebut that or to address that or to explain how a person of skill in the art would have gone from those systems. Are we talking about combining, what is it, Gifford and CompuServe, right? Correct. There were two combinations. So for the 639, it was Johnson and Gifford, and then for the other two patents, it was CompuServe and Gifford. So you're saying the difference between that. And then for anticipation, what was the anticipatory reference, CompuServe? Well, see, for the CompuServe reference, there were a couple of references, but yes, it was CompuServe and then Johnson 008 patent for the other patent. So you're saying, okay, teaching away the fact that there was no legal conclusion, the fact that there were numerous elements missing? That there were numerous elements missing, and all taken together, it was a hindsight analysis. Basically, what the expert was doing was using the claims as a roadmap and saying, well, I may have this here, I may have this here, but we don't have this element. And so, you know, I look at the Internet technology at the time, and I fill in the blank. That just didn't do it. There wasn't anything that was instructing or explaining how a person of ordinary skill in the art would actually put those things together that wasn't based on using the claims as the roadmap. It's a little hard to review the decision, right? Since, I mean, all of what you've said, I don't dispute it in any way, but, I mean, all the district court judge gave us was, and tell me if I'm wrong, one line. I mean, he did not express any opinions on obviousness or conduct a proper Graham analysis. You're not sure what he was referring to in Graham, and you're saying what you think. Is there any basis for knowing what precisely he was relying on? Well, actually, at the oral argument on this issue or when he made his ruling on this issue, he said, look, this isn't even a close call. And then he mentions in his opinion that it's missing fundamental Graham factors. We recited the testimony that was introduced by Newegg's expert on obviousness, and if you read that testimony, it's clear that there are multiple Graham factors that are missing, and he's not drawing the connections that you need for even a prima facie case of obviousness, even to get to that threshold, particularly given their clear and convincing burden. The judge didn't really decide on the basis that the presumption had not been overcome and that there just was an inadequate presentation. He actually reached the conclusion on the merits, did he not? I think the judge said that he was granting JMOL because he didn't feel that they had even met their initial threshold. Because he wasn't going to give it to the jury. That's correct. But he was going to decide it. I don't think that he decided it. I think that he looked at the evidence and he decided that there wasn't enough because they hadn't met the fundamental Graham factors. You're saying there was no decision on obviousness? Oh, no, of course not, Your Honor. He granted JMOL on obviousness. Exactly. Well, that was really my question. I think that the point we were trying to explore is that if the judge feels that there's enough evidence on which the substantive issue can be determined, whether, in fact, it was correct to take it from the jury. I think that's right, Your Honor. Yes. I think that he looked at the evidence. That's the question, is it not? Yes. And I think that that is made plain from the lack of evidence from Newegg's expert and, in particular, not even responding to the points on teaching around secondary considerations. What I'm asking is how can the judge decide it if he thinks the jury could decide it? Well, I think that the judge decided that there wasn't enough evidence to bring to the jury because Newegg hadn't met its burden of production in establishing a prima facie case. So no reasonable jury, given the lack of evidence on fundamental aspects of the obviousness analysis, given that, that no reasonable jury could have found for Newegg, and so he granted JMOL on that basis. All right. I hope that answers your question. No, it doesn't. Would you proceed to any other issue that you wish to raise? Could I raise another issue? Sure. Can you—this is on the hypertext statement claims. Yes. And on the evidence or lack thereof of direct infringement. Yes. I mean, one of the arguments you made is that, well, the jury could have relied on its own experience in using Newegg, the Newegg website, to conclude that there was actual use. Yes. Really? I think that there's— I mean, did we do that? Is that the test we provide? Like, even though there's no evidence of anybody using this, there's no evidence in the record, but we could say, well, the jury could infer maybe they've used it. No, I think that there is much more evidence in the record, circumstantial evidence demonstrating customer use of the hypertext statement claims, and we attempted to point that out in our brief as well. So if you take a look at the Newegg system, when you first go online with the Newegg system, it's got a banner that's around the main page. It directs you right to the hypertext statement claim. So this is a fundamental feature of the website. In other words, it's not a throwaway or a secondary feature of the website. This is the way that customers are able to track their transactions or look at their order history. So it's a feature, so we should assume every time there's a feature, there's no evidence required of direct use? No, I think that it is a feature that is prominently displayed on the website, and as the customer goes through the website, it follows through with the banner. There is also instructions regarding the use. Why didn't you put on evidence of customer use? I mean, presumably it wouldn't have been that hard, right? Well, my understanding, Your Honor, is that there wasn't direct evidence from Newegg as far as tracking the customer use on the website to that level of granularity, but it wasn't required in the sense that the Newegg instructs its customers how to use this system. It's featured prominently on the website. It's on every page as the customer scrolls through. Do you have any cases, or cases, in which we've inferred customer use based on prominent features and so forth? Are there cases? I'm sorry, there were so many issues in this case. I don't remember right now if you cited cases in your brief. Your Honor, I believe we rely on the ECO case and the Lucent case in our argument here. And the important thing is that by being this kind of prominent feature and then looking at the nature of the website, it is incredible to believe that customers who are shopping online are not going to track their transactions and are not going to be interested in their order history. And so the argument that you raised, Your Honor, as far as this being part of the customer's or the jury's experience, I think it's part of customer experience and the nature of this type of website. Again, it reinforces the fundamental nature of this type of system for this type of online retailer. And all of that was explained to the jury. So all of that evidence forms the basis for a conclusion that, yes, customers use this on the website. It is a prominent feature and it's essential to Newegg's operation of its business. And, of course, customers track their products and look at their order histories. And the only system that's available on Newegg's website is the admittedly infringing hypertext statement claim. ECO went the other way, by the way, according to your brief. You tried to distinguish ECO, but ECO is the case that Newegg is relying on. Yes, and with respect to ECO, the instructions that were provided there were both infringing and non-infringing. And so we were distinguishing that in the case here because the instructions that are provided online are infringing. It directs you right to this hypertext statement system. And there's no contention from Newegg that its system doesn't meet the limitations of the claims. They concede that. So each and every one of the limitations that are recited in the hypertext statement claims are found in its infringing system. So that's admitted. So the only issue then here was they say there wasn't enough evidence of use. But as I've said, Your Honor, there's more than enough circumstantial evidence that customers go online, they shop on Newegg's website, and this is a prominent feature that allows them to track their order history. Can I have another minute or two if there's another point? Yes, I just wanted to touch briefly on the issue that Mr. Ranis raised with respect to the shopping cart claims and how there isn't a requirement to modify. And, you know, that's completely contrary to the evidence and to the way that this system works. What he's trying to read into the claims is a physical setting aside of database or data storage space. And that's not how the court construed the claim. That's not what the claim recites. To modify merely means was construed to be an instance, to modify an instance of a shopping cart. And that's different than modifying a specific physical space in the database. And that's important because Newegg didn't contest that construction, and that was the basis for Sovereign's expert testimony. And what he showed was that the Newegg website identifies a shopping cart ID, and then it loads the customer-selected products into the database and associates it with that shopping cart ID. And that shopping cart ID is the instance of the shopping cart. That's not disputed, is it? That's not in dispute, is it? Well, the application to the claims is in dispute because they're saying the identification of a shopping cart ID is not enough to be an instance of a shopping cart. But that's exactly what it is. It is a pointer to the shopping cart, and products are associated or taken away from that shopping cart. Once you create that instance, you modify it by adding or subtracting products. Isn't all that information stored on the customer's computer and not the Newegg servers? In Newegg's system, initially, yes. The information about the products is stored on the customer's computer, and then that is sent when the customer checks out to the Newegg server. So up until they check out, all the information that is being changed or modified resides on the customer's computer and not Newegg's servers? That's correct. But then when the products are downloaded from the customer's computer to Newegg, then there's the creation of the shopping cart ID, which is the instance of the shopping cart. That's the first step. And then the products that the customer has selected are then associated with that shopping cart. And what they're trying to read in is a limitation that says you set aside some space in your database and then you put those products in. That's not what the claims require. As the court construed, and they don't dispute, the court construed modify to be modify an instance of a shopping cart. So the creation of the ID is the instance, and the downloading is the modification of that. Okay. Have you any more questions, Mr. Paul? Any more questions? Thank you, Your Honor. We're out of time, but we have your points. Thank you, Mr. Wilson. Mr. Reyes. Thank you. I'd like to start with obviousness. What you heard was that there were missing elements, and that would be great if they had a jury verdict in their favor and they were trying to support it with substantial evidence. But there is conflicting evidence, which a jury was entitled to consider, leaving aside that I think common sense under Western Union and all those other cases would permit you to say, yeah, you include a receipt that you can click on a hot spot on your website. Leaving aside the manifest obviousness of that, on shopping cart, A2316, 18, A2142, it's all that shopping cart was present in the prior art. On hypertext statements, A2331 through 36, that hypertext statement was in the prior art. On session identifier, 2340. And these aren't combinations. They need to show for each of the different claims. Let's not fall into the trap that the district court did of looking at these as though it's one invention with all these things. They have an invention that's just the idea of a receipt on a website that you click to. That's what this court would uphold, that a jury can't even consider whether that's obvious. That's what we're talking about. And in turn, let's get beyond. So the statement, there was two things that were supposedly missing that didn't happen in the prior art. I gave you sites, and there are more in our brief, that in fact there was testimony that was confident that it was in the prior art. Second is, what you really heard, there was some hand-waving. What you really heard when you listened hard was, well, there's teaching away. What does that mean? What did he mean, teaching away? Well, they said if you go from this private network, CompuServe, where you have to dial up in an old-fashioned modem, and you bring that to the Internet, it's broken. It won't work. You can't use the idea of a shopping cart or a receipt or that you have a session number for your session. You can't use those ideas over the Internet. That would be non-obvious, and no reasonable person could consider that obvious. That's their argument. But their basis is it wouldn't work. Boy, do we have evidence that it would work. Boy, do we have that evidence in this case. We have simply knowing that you can do something like store information about purchases means that a proper computer programmer can figure out how to do it. The asserted claims of 492 match up with the teachings of the CompuServe books, basic Internet functionality, and common sense. That's at A2336. At A2312 through A2313, programming the desired functionality was within the skill of one in the art. The teaching away is that someone wouldn't know how to program a computer to have a shopping cart database. Someone wouldn't know how to program a computer to have an HTML. At A2335, the expert says anyone who could get the receipt text could use HTML to present it. HTML was a well-known technology that you used to make an Internet page. So there's nothing else. There's no other thing that he says is missing. It's all in the record, and the judge didn't even let the jury decide it on seven different claims and three patents without any explanation. What were the role of cookies in the prior art? In the prior art, they didn't use cookies. They had this process that the claims cover of you go one by one and you move the product into the database one by one. And this is in the record. That was an innovation later on that Newegg uses of you save memory by having the customers do it, and you involve less transactions. You don't need a plurality of messages. Their claim needs a plurality of messages. Let me move swiftly right now to the shopping cart infringement argument that was made, which is—and Judge Randall, you nailed it is the way this thing works. It all goes in en masse at the end, and the hand-waving is, well, there's the shopping cart ID number, right? The instance of a shopping cart. It's all narrowed down to that. The only thing they have left is there's a shopping cart ID number that's placed to the shopping cart, and then that all merges into the shopping cart database. There's no modification of anything in the database. And the answer that there's a number that's not in the shopping cart database—admittedly, the counsel was candid and clear about that—the number isn't an instance of a shopping cart. What's the justification for that? And it's certainly not. What's absolutely, perfectly clear is it is not an instance of a shopping cart in the shopping cart database. He will not get up here and tell you that the shopping cart ID number has ever allocated memory in the shopping cart database because it wouldn't be true. So he's relying on that the word instance is sort of fancy, an instance of a shopping cart. That means a version of a shopping cart that's modified in the shopping cart database. But we don't have to use our brains to say, okay, what does this really mean? This is envisioning the embodiment in the patent and the way the claims read, which is a plurality of messages, putting product by product, a plurality of products in the shopping cart database, which is modified in the shopping cart database. Not how our system works. We're running out of time. Did that answer your question about cookies? Your Honor, can I indulge you for just a minute on damages? Okay. That is very generous of you. The reference there was there has to be a slight effect in order for the admitted legal error that affected the damages analysis here to be survivable. Five times the only competent evidence in the record is not slight. The only competent evidence is 500,000 or below with the licensing history, which I won't go through again. But the second point I want to make on that is the only thing, there was really nothing in substance in terms of what the evidence was. The gram factors. What was it? Extensive use. Two-thirds of the uses, undisputed, were for single product purchases. Someone got on Newegg and bought one item and brought it back. Clearly not infringed because the claims require plurality. They don't argue otherwise. So the question is, two-thirds of the transactions shouldn't even have been charged and why? What's their response? Their response is, well, the system's capable of that. But, and this gets a little fancy, in order to avoid the divided infringement problems that they had, they argued, consistent with Centilli in the new case, that it's use of the system. That the customer's using the system. They're saying there's no make of the system. There's no sell of the system. There's no import of the system. It's only use of the system for their divided infringement when they're trying to survive that problem. But then when they come over to the damages part, they say, well, we don't need actual use. We're going to charge you for two-thirds of the transactions for a single product purchase, notwithstanding the claims require plurality and notwithstanding the fact that use is our theory. Thank you very much, Your Honor. Thank you, Mr. Reines. Thank you, Mr. Wilson. Could I respond briefly, Your Honor, to a couple of the points that you raised, particularly with regard to Centilli? Okay. Thank you, Your Honor. Okay, to be fair. So, just to address this issue with respect to obviousness, he's saying that there's no evidence. No, not on obviousness, but only on any new point that Mr. Reines made, which I think was just his final point on divided infringement. Two points. With respect to the infringement argument, Mr. Reines ignores DOE. With respect to the single product analysis, the claims are not limited. They do not exclude single products. In fact, it wouldn't make sense to do that. The claims recite the system being programmed to accept more than one product into the shopping cart. And so single products orders would still be encompassed within the scope of those claims. Thank you. Okay. Thank you, Mr. Wilson. Thank you both. The case is taken under submission.